ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Northrop Grumman Corporation ) | ASBCA No. 60190 |
| ) | |
| Under Contract No. N68936-05-C-0059 ) | |

APPEARANCES FOR THE APPELLANT:       Terry L. Albertson, Esq.
                                     Stephen J. McBrady, Esq.
                                       Crowell & Moring LLP
                                       Washington, DC

APPEARANCES FOR THE GOVERNMENT:      E. Michael Chiaparas, Esq.
                                       DCMA Chief Trial Attorney
                                     Robert L. Duecaster, Esq.
                                       Trial Attorney
                                       Defense Contract Management Agency
                                       Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE PEACOCK
ON THE GOVERNMENT'S MOTION FOR RECONSIDERATION

The government has moved for reconsideration of our opinion in *Northrop Grumman Corporation*, ASBCA No. 60190, 17-1 BCA ¶ 36,800 (hereinafter referenced as "quantum decision").[1] In its Motion for Reconsideration (Motion), the government continues to maintain that Northrop Grumman Corporation (NGC) should have incurred, and in fact was required "by operation of law" to "incur" $253 million more than the Post-Retirement Benefits (PRB) costs actually incurred by its PRB Plan during the pre-transition years, commensurately increasing the costs of its flexibly-priced contracts, including major weapons systems purchased from NGC. Because appellant failed to incur/accrue, assign, and fund or claim the amount disallowed in the pre-transition years, the government, without any factual support or proof, alleges that the unfunded, disallowed amount was "incurred by operation of law," somehow was included in the "transition obligation" and that appellant has been "claiming" the disallowed costs as part of the annual amortization of that obligation since 2007 in the "post-transition" years. The government primarily relies on alleged "inconsistencies" among the quantum decision and earlier "Entitlement Phase" decisions. *Northrop Grumman Corporation*, ASBCA No. 57625, 14-1 BCA ¶ 35,501, *aff'd on recon.*, 14-1 BCA ¶ 35,743 (hereinafter the "entitlement decisions"). It asserts that the holdings of the entitlement decisions

---

[1] The government motion also requests that this appeal be referred to the Board's Senior Deciding Group. The Board's Chairman has denied that request.

became the "law of the case" which the Board failed to follow in the quantum decision. Briefing related to the motion was concluded on 15 November 2017.[2]

Upon reconsideration, we affirm the quantum decision. There are no inconsistencies among the quantum decision and the Board's earlier entitlement decisions. The government's assertions that the Board contradicted the "law of the case," i.e., the entitlement decisions, are based on the government's untimely raised and unreasonable "interpretation" of the entitlement decisions. Moreover, the government has ignored the quantum remedy for noncompliance established in FAR 31.201-2(c). In addition, it has misapplied fundamental concepts of cost "incurrence" and "disallowance."

The government's initial brief supporting its Motion focused on what it alleges are differences in the purported "philosophy" and "intent" of the quantum decision *vis-a-vis* the entitlement decisions.[3] The "philosophy" and "intent" of a Board decision are best derived from its language. The basic holding of the entitlement decisions was that appellant failed to comply with the FAS 106 PRB cost accrual methodology in the pre-transition years. The quantum decision addressed the monetary consequences of that noncompliance. In particular, nothing in the entitlement decisions considered, much less condoned, the central premise of the government's quantum position, i.e., that NGC was required to, and thus actually did, "incur" $253 million more PRB costs "by operation of law" in the pre-transition period and that, somehow in

---

[2] The Board's previous entitlement decision "conclude[d] that FAR 31.205-6(o) supports the government's disallowance of unfunded [PRB] costs" and remand[ed the appeal] to the parties to determine quantum." *Northrop Grumman,* 14-1 BCA ¶ 35,501 at 174,025, *aff'd on recon., Northrop Grumman,* 14-1 BCA ¶ 35,743. After the parties were unable to resolve quantum, the Board heard "the 'quantum phase' of the parties' disputes regarding a government disallowance, totaling $253,361,512, of [PRB] costs associated with the 'transition' of [appellant] from its 'pre-transition' accrual methodology to the methodology prescribed in FAR 31.205-6(o)." *Northrop Grumman,* 17-1 BCA ¶ 36,800 at 179,363. The Board held there that the government's disallowance of this sum was incorrect, and "that the government suffered no damages as a consequence of appellant's use of the DEFRA methodology during the pre-transition years." This was because the contractor had "specifically and expressly executed a 'negative' Plan amendment" in 2006 which "ensured that NGC would never incur the costs disallowed and effectively mooted allowability issues associated with the transition obligation and the change in NGC's cost accounting practices related to PRB costs." *Id.* at 179,372. Familiarity with these decisions is presumed.

[3] Presumably, the government refers to the alleged "philosophy" and "intent" of the two judges participating in the "entitlement decisions" who retired before issuance of the "quantum" decision. The third judge participated in all decisions.

2

a manner never detailed or proved, the government-fabricated "costs" thus "incurred" found their way into the transition obligation to be amortized in the post-transition years.

On 12 October 2017, the government filed a "Reply in Support of the Government's Motion for Reconsideration" (gov't reply), wherein the government alleged that the entitlement decisions definitively held that the disallowed costs were included in the "transition obligation." To the Board's knowledge, this is the first instance where government counsel expressed such an interpretation of the entitlement decisions from the filing of the quantum appeal in September 2015 to October 2017. When notified by the gov't reply of its "interpretation," the Board issued an Order seeking additional briefing and answers to a series of questions to the parties for further clarification on 17 October 2017. In accordance with the schedule prescribed in the Board's 17 October 2017 Order, the government filed its response on 1 November 2017 (gov't answers) and appellant on 15 November 2017. We have reviewed the parties' respective responses. Among other things, the Board specifically asked the government where its current pivotal interpretation of the Board's entitlement decisions was asserted in the post-hearing quantum briefs. The answer, as appellant succinctly emphasizes, is "nowhere." We consider that the late-asserted issue and "interpretation" has been waived by the government. Moreover, if the Board had reached such a critical conclusion in the entitlement decisions, it would have effectively disposed of the central and dispositive issue of the entire quantum phase of the proceedings. There would have been no need for the quantum phase if the Board's entitlement holding resolved all issues associated with the computation of the "transition obligation." As the government admits, "theoretically" there would not have been any need to prepare and proffer at trial the government's expert opinion expressing for the first time the government's "cost incurrence by operation of law" theory, nor any need for further evidence, argumentation and briefing of those issues. (Gov't answers at 4) Indeed, the matter would have been resolvable by summary judgment disposing of the quantum phase issues without more than two years of litigation centered on the composition of the transition obligation. The only "inconsistency" is between the government's position advocated by counsel for the first two years of this litigation and its "interpretation" first advanced in October 2017 in the gov't reply, supplementing its Motion.

Not only is the government's late-asserted interpretation untimely, it is also patently unreasonable. Again, boiled down to its essence, the government now maintains that the entire quantum phase "theoretically" was superfluous and unnecessary. To the contrary, the entitlement decisions consistently emphasized the lack of critical quantum details in the entitlement record that would be required to intelligently evaluate issues associated with the "transition obligation." The entitlement decisions expressly acknowledged that these did not address NGC's argument that, as a result of the PRB plan change in 2006, the disallowed costs "will not be incurred and as such, the government has no reason to disallow them." The entitlement decisions, noting the paucity of quantum details generally, also expressly and specifically stated

3

that the Board required "a better developed record to address" whether the costs had been incurred or would be incurred and claimed in the post-transition years as part of the amortized "transition obligation." Thus, the quantum phase proceedings.

*All* "quantum" issues were before the Board in the "Quantum Phase" proceedings. Among other things, the entitlement decisions do not address, much less express approval of, the quantum details supporting the government's computation and extraordinary "disallowance" of unincurred, unclaimed and unreimbursed costs. *All* details regarding the quantum consequences of noncompliance with the FAS 106 methodology and computation of any government remedy were remanded to the parties. There is no inconsistency among the decisions.

In fact, a principle mandate of the entitlement decisions required the parties to evaluate in the quantum phase whether the $253 million was included in the transition obligation or eliminated by the 2006 Plan amendment. Perforce, if the Entitlement panel had adopted the government's position regarding the "incurrence" of those costs "by operation of law" in the pre-transition years there would have been no need for quantum phase proceedings. The entitlement decisions essentially instructed the parties to resolve a primarily actuarial question requiring them to delve into the details of the computation of the "transition obligation" and the consequences of the 2006 PRB Plan amendment. Only appellant constructively responded to that primary directive and issue. Appellant provided the only persuasive evidence, including expert, testimony conclusively establishing as a fact that the Plan did not include any pre-transition year PRB costs, calculated pursuant to the FAS 106 methodology, in the transition obligation. The government failed to sustain its burden of proving otherwise. The Board at the time of the entitlement decisions had never even been presented with the government's "cost incurrence by operation of law" theory, much less a cogent explanation of how such "costs" found their way into NGC's transition obligation. Obviously, it could have drawn no definitive conclusions regarding the government's theories that had never been developed until the quantum phase proceedings.

The gravamen of this dispute has always been whether the government was damaged, i.e., in the words, of FAR 31.201-2(c) whether the contractor claimed (or the government paid) any disallowable "excess" PRB costs as a consequence of appellant's noncompliance. The ultimate overriding fact is that the government did not pay any "excess." It cannot overcome that basic fact that there was no "excess" by parsing through the entitlement decisions trying to find "inconsistencies," actual or implied in the supposed "philosophy and intent" of those decisions. The Board *emphasized* that it had virtually no quantum facts and left *all* quantum issues to be decided on a full record. The pertinent "law of the case" is that the entitlement decisions specifically and expressly refrained from drawing any quantum conclusions until it had a fully-developed record. The quantum phase proceedings clearly established that the contractor did not claim any excess. The government attempts to

4

absolve itself of this failure of proof by focusing on alleged "inconsistencies" between the entitlement decisions and the quantum decision. There are no such inconsistencies. The thrust of those decisions was always to leave the ultimate quantum questions open for full examination and scrutiny on a fully developed quantum record. The entitlement decisions contained no pre-judgment of quantum or any quantum-related issue. Any reading of the language of those decisions to the contrary is simply disingenuous and incorrect. Even if the entitlement decisions somehow could reasonably be construed to be inconsistent, it does not change the fundamental fact that the contractor has never claimed, and will never seek reimbursement of the costs and the government has never and will never pay the amount disallowed. Regardless of any possible inconsistency, fundamental fairness requires that those quantum phase conclusions would necessarily be dispositive and controlling.

The government position disregards, and is also inconsistent with, the FAR-prescribed remedy for noncompliance. The government has declined to address the Board's discussion of the overall status and quantum impact of FAR 31.201-2(c) on cost allowability generally. As emphasized in the "quantum decision," the latter provision places the current dispute in context and perspective. It provides the government with a general remedy in the event of a non-compliance with more specific cost principles. The government arguments fail to meaningfully consider that remedy. Only the "excess" is unallowable. There are no "excess" NGC PRB costs to disallow in this case.

One express mention of an arguably "quantum-focused" issue in the "entitlement decisions" occurred in the Board's discussion of a "ceiling" on allowability of PRB costs in its reconsideration of the entitlement decisions. However, the Board merely observed that there was no express mention of a "ceiling" in FAR 31.205-6(o). The Board expressed no opinion on the impact of FAR 31.201-2(c) on the quantum consequences of non-compliance and the limits of the government remedy reflected in the latter provision. FAR 31.205-6(o) must be analyzed and interpreted in the overall context of the cost allowability provisions generally. The interrelation of that provision with FAR 31.202-2(c) is critical. The "ceiling" is created by reading the two provisions together. The former establishes allowability criteria and the latter prescribes the government's "quantum" remedy for noncompliance therewith.

The government has not challenged the Board's discussion of cost incurrence by the contractor except to reassert its central contention that appellant "incurred" the $253 million "by operation of law" regardless of what the contemporaneous documentation reflects. The most persuasive evidence and indicia of cost incurrence are contemporaneously-submitted incurred cost and forward pricing proposals for the pre-transition period, none of which contained any portion of the $253 million "disallowed." During that period, there was never any contention that appellant had actually "incurred" the "disallowed" "costs" in question. The government ignores not

5

only NGC's Plan, but all the contemporary core cost/pricing/payment related documentation and even its own FAR-prescribed remedy, to calculate and assert this disallowance. The "government "disallowed" costs that were never incurred, never claimed and never reimbursed. The government developed its current theoretical construct in 2015 during the prosecution of the quantum phase appeal divorced from the reality of all contemporaneous cost incurrence documentation and related cost submissions 10-20 years earlier.

The concept of cost incurrence "by operation of law" in a government contract accounting "allowability" context is indeed novel, extraordinary, unique and unprecedented. The government has failed to adduce even one analogous case supporting its position. The government contemporaneously exercised common sense during the pre-transition years and knowingly, willingly, declined to challenge appellant's accounting for its claimed PRB costs that resulted in *lower* costs to the government during the pre-transition years. The "common sense" government position in this regard in the pre-transition years comported with FAR 31.201-2(c). The government now ignores its own regulatory remedy. In doing so it has created an extraordinary new category of costs, incurred not by the contractor's own accounting measurement, accrual or assignment methodology, but allegedly "required" to be incurred by "operation of law," without regard to NGC's accounting procedures. To the contrary, the operative "law" in this case is the common remedy prescribed for noncompliance in FAR 31.201-2(c). The government's duty is to evaluate costs actually incurred and claimed *by the contractor* under the pertinent cost principle for compliance. If non-compliant, any "excess" is unallowable, not costs that were never incurred or claimed by the contractor.

The sole government defense of its "cost incurrence by operation of law" theory is based on general platitudes to the effect that laws and regulations often require the incurrence of costs. There is nothing particularly remarkable about that basic truism in the abstract. But the question in the specific context of a government contract cost "disallowance" dispute is whether the government was damaged, injured, harmed, i.e., whether it was charged and paid any "excess" as a consequence of noncompliance with a cost principle. Here the regulation itself provides the remedy for the regulatory noncompliance. FAR Part 31.201-2(c) provides an express remedy for the FAR Part 31.205-6(o) noncompliance. Again, the government's theoretical constructs wholly ignore that remedy because the government was never damaged and never has paid any "excess" as a consequence of the noncompliance. The government's position only makes sense if the contractor sought to incur in the future (via the transition obligation in this case) and seek reimbursement (via amortization of the transition obligation in the "post-transition" years) of costs that properly should have been measured, accrued, assigned (and funded in this case) in previous accounting periods. NGC did no such thing as detailed in the "quantum decision," as a consequence of the 2006 Plan amendment and calculation of the transition obligation.

6

A primary purpose of the exercise of computing the transition obligation was to reconcile the non-compliant DEFRA methodology with the FAS 106 methodology. Because the DEFRA methodology required the incurrence of less costs in the pre-transition years than the FAS 106 methodology, the difference could have been carried forward into the transition obligation in the reconciliation process for amortization in the post-transition years. Thus, the reasonable government concern was not that the costs had been "incurred" in the past, i.e., the pre-transition years, but that they might be incurred in the future post-transition years. If appellant had carried forward such costs into the "transition obligation," they would *first* be incurred in the future via the amortized annual payments, i.e., during the post-transition years. Unless the costs were included in the transition obligation, they never would be incurred, much less claimed, *at any time*. Computation of the transition obligation did not occur until 2006. The government disregards the actual facts of how that obligation was computed. In particular, it has failed to analyze appellant's PRB plan, ignores the 2006 Plan amendment, and has failed to rebut appellant's proof of the impact of that amendment on the calculation of the transition obligation.

The term "disallowance" presupposes that the contractor has sought an "allowance" for the cost in question, i.e., it has included those costs in contemporaneous cost-related filings and claimed, charged or been reimbursed for said costs. Here, the government has "disallowed" costs for which the contractor has never sought an "allowance." The contractor has not and will never claim the costs in dispute here for the reasons detailed in the underlying opinion. The "excess," if any, is to be derived from cost/pricing, payment, and reimbursement submissions, including incurred cost data transmitted to the government from the contractor. There is no mention in any of these foundational, core documents that appellant ever incurred the costs in dispute, much less claimed their reimbursement. There was no "excess" to disallow, given our factual conclusion, unrebutted by any government evidence, that any "excess" was not included in the transition obligation or otherwise amortized in the post-transition years. Here, the "excess" which is the subject of the government "disallowance" consists solely of phantom costs the government "created" in accordance with its theoretical construct that the costs were required to be incurred. Therefore, they were incurred "by operation of law." The government then "disallows" the "excess" government-fabricated "costs" that were never charged by the contractor nor paid by the government. The alleged "excess" that the government has disallowed was wholly-manufactured by the government in its creation of a heretofore unprecedented, in government contract accounting/allowability practice, category of costs that were "required" to be "incurred" by the contractor "by operation of law."

We also reemphasize that the "required by operation of law" theory advocated by the government in this appeal is unreasonable *per se* because it shortsightedly would "require" NGC to use the FAS 106 calculation and charge the government $253 million

*more* than NGC actually charged the government using the DEFRA methodology during the pre-transition years. Such a position is patently devoid of common sense. The government benefited by buying weapons systems and other major systems at a commensurately *lower* cost to the extent that the $253 million thus saved would have been allocable to appellant's flexibly-priced contracts. In essence, the government interpretation *discourages*, rather than encourages contractors to institute cost saving measures. Our quantum decision recognized that some contractors maximize cost saving measures and increase their price/cost competitiveness rather than be penalized for not incurring and claiming the maximum amount allowed by regulation.

The Board's general mention of "damages" and "injury" in the quantum decision were a response to the government's extraordinary quantum theory that ignored basic concepts of cost "incurrence," and "disallowance" as well as the FAR Part 31 remedy for noncompliance. The Board was attempting to determine how (if at all) the government was actually damaged or injured by the noncompliance absent inclusion of the costs in question in an incurred cost or forward pricing proposal that could serve as the basis for any "disallowance." *E.g., Servidone Constr. v. United States,* 931 F.2d 860, 861 (Fed. Cir. 1991) (a claimant under the CDA must prove liability, causation, and injury to recover). In effect, FAR 31.201-2(c) by regulation imposes an analogous rule in cost disallowance disputes to prove damages. We remain at a loss to understand how the government was damaged or injured by the cost *savings* accruing to it as a consequence of the contractor's use of the DEFRA methodology during the pre-transition years. In any event, it is clear beyond cavil on a fully developed quantitative record that appellant never has and never will incur and claim the disallowed costs and the government never has and never will pay any "excess" resulting from the noncompliance. The government failed to prove otherwise. The entitlement decisions did not short circuit the requirement that the government was required to prove its quantum damages.

Having reconsidered our decision, it is affirmed.

Dated: 9 January 2018

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

8

I concur                                    I concur

RICHARD SHACKLEFORD                         REBA PAGE
Administrative Judge                        Administrative Judge
Acting Chairman                             Acting Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60190, Appeal of Northrop Grumman Corporation, rendered in conformance with the Board's Charter.

Dated:


JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9